UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MOUNTAINEERS FOUNDATION,

                    Plaintiff,

        v.

THE MOUNTAINEERS,

                    Defendant.

Case No. 2:19-cv-1819-RSL-TLF

REPORT AND
RECOMMENDATION

Noted for April 22, 2022

This matter comes before the Court on the Mountaineers Foundation's ("Foundation") motion for partial summary judgment (Dkt. 87) and The Mountaineers motion for summary judgment (Dkt. 91). This matter has been referred to the undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v. Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a)(4). For the reasons discussed below, this Court should DENY the Foundation's motion for partial summary judgment (Dkt. 87) and GRANT IN PART AND DENY IN PART The Mountaineers' motion for summary judgment (Dkt. 91).

A.  <u>FACTUAL BACKGROUND</u>

The Mountaineers was founded in 1906 as a non-profit organization with the purpose of preserving the natural beauty of the Northwest America. Dkt. 95, Articles of Incorporation for The Mountaineers, at 14; Dkt. 88-1, 1985 Conservancy Agreement (06/19/1985), at 110. In the 1930s, The Mountaineers received tax exempt status under

Section 501(c)(7) of the Internal Revenue Code. Dkt. 95, Declaration of Tom Vogl ("Vogl Decl.") at ¶ 3. The Mountaineers retained this tax-exempt status until 1972. *Id.* In 1976, The Mountaineers regained tax-exempt status under Section 501(c)(4) of the Internal Revenue Code. Dkt. 95, Letter from Internal Revenue Service (06/23/1976), at 18-19. And later -- in 2011 -- The Mountaineers received tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. Dkt. 95, Vogl Decl., at ¶ 16.

The Foundation was formed and incorporated on June 24, 1968. Dkt. 1-1, Articles of Incorporation, at 8-13.  Joan Hansen, one of the original incorporators of the Foundation, testified that the Foundation was set up as a charitable organization for The Mountaineers so that people who wanted to donate to The Mountaineers could get a tax deduction. Dkt. 92, Deposition of Joan Hansen ("Hansen Dep.") at 7, 9, 10. Ms. Hansen also testified that the Foundation was designed to be a separate entity affiliated with The Mountaineers. *Id.* at 16.

In the early 1900's The Mountaineers acquired various parcels of real property in Kitsap County collectively known as the Rhododendron Preserve (the "Preserve"). Dkt. 89-1, Exhibit 1, 1985 Conservancy Agreement, at 3; Dkt. 93, Declaration of Delmar M. Fadden ("Fadden Decl.") at ¶ 6. In 1985, The Mountaineers transferred the Preserve to the Foundation (without cost) by warranty deed. Dkt. 89-1, 1985 Conservancy Agreement, at 4.

As part of the transfer, the parties agreed that "The Mountaineers shall retain the right to continue to use the Preserve for historic and present use after the transfer to The Foundation for Mountaineers activities, subject to the provisions of the open space agreement and applicable law. *Id.* at 5, 7. The parties also entered into a

1    contemporaneous 1985 Management Agreement, which stated that the Foundation

2    owned the property and The Mountaineers would act as an agent managing and

3    maintaining the Preserve. Dkt. 89-1, Exhibit 4, 1985 Management Agreement

4    (06/19/1985), at 17-22.

5            In 1990, The Mountaineers and the Foundation entered into a Management

6    Agreement stating that The Mountaineers would continue to manage and protect the

7    Preserve as well as provide insurance for the Preserve. Dkt. 89-1, Exhibit 5, 1990

8    Management Agreement (06/19/1990), at 24. The agreement states that The

9    Mountaineers would have unlimited access to the Preserve for education and

10   enjoyment, customary ingress, egress and easement for utilities to the Mountaineers

11   property through the former Wymer Parcels and parking on the Reid Parcel for

12   Mountaineers events. *Id.*

13           In 2007, the parties entered into a Fiscal Sponsorship Agreement. Dkt. 95, 2007

14   Fiscal Sponsorship Agreement (01/04/2007), at 55-62. The 2007 Fiscal Sponsorship

15   Agreement created a separate restricted fund for donations made to support The

16   Mountaineers' charitable activities, that would be owned by the Foundation for tax

17   purposes, but would be used to support The Mountaineers' charitable activities. *Id.* at

18   55-56. The 2007 Fiscal Sponsorship Agreement also stated that The Mountaineers

19   owned all rights to intellectual property resulting from or created by funding under the

20   2007 Fiscal Sponsorship Agreement. *Id.* at 59.

21           In 2019, the Foundation sent The Mountaineers a letter formally terminating the

22   1990 Management Agreement and the 1985 Conservancy Agreement. Dkt. 89-1,

23   Exhibit 6, Letter from the Foundation (12/11/2019), at 26-29.

24

25

B. <u>RELEVANT TRADEMARKS IN DISPUTE</u>

- (THE) MOUNTAINEERS FOUNDATION (Washington Reg. No. 60088) ("088 Mark"). Registered to the Foundation on July 10, 2017. First Use in 1968. Dkt. 1-1, Washington State Registration Certificate, at 41 (Exhibit G).

- THE MOUNTAINEERS FOUNDATION (Fed. Serial No. 88,643,474) ("474 Application"). Pending Trademark Application filed by The Mountaineers on October 5, 2019 for "Charitable services, namely raising funds for and awarding grants to organizations supporting the environment, conservation, outdoor education, outdoor recreation, and natural history." Alleging First Use as early as June 1968 and First Use in Commerce as early as June 1968. Dkt. 1-1, Federal Trademark Application, at 43-50 (Exhibit H).

- THE MOUNTAINEERS word mark (Fed. Reg. No. 5,350,305) ("305 Mark"). Registered to The Mountaineers on December 5, 2017 for "Charitable fundraising services for the environment, conservation, outdoor education, outdoor recreation, and natural history." First Use: March 31, 1907; First Use In Commerce: June 30, 1913. Dkt. 38, Federal Trademark Application and Registration, at 39-41 (Exhibit 2).

- THE MOUNTAINEERS design mark (Fed. Reg. No. 5,350,307) ("307 Mark"). Registered to The Mountaineers on December 5, 2017 for "Charitable fundraising services for the environment, conservation, outdoor education, outdoor recreation, and natural history." First Use: December 29, 2004; First Use In Commerce: December 29, 2004. Dkt. 95-1, Federal Trademark Application and Registration, at 69-70 (Exhibit 11).

- MOUNTAINEERS BOOKS word mark (Fed. Reg. No. 5,483,968) ("968 Mark"). Registered to The Mountaineers on June 5, 2018 for "Books in the field of environmental conservation, outdoor recreation, and natural history." First Use: April 30, 1960; First Use in Commerce: April 30, 1960. Dkt. 95, Federal Trademark Registration, at 72-74 (Exhibit 11).

## C. DISCUSSION

Summary judgment is supported if the movant "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure (FRCP) 56 (a),(c). The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine dispute concerning a material fact is presented when there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In this context, materiality means the fact is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit"; thus, materiality is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The non-moving party is required to show that genuine issues of material fact "'can be resolved only by a finder of fact *because they may reasonably be resolved in favor of either party.'" California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson,* 477 U.S. at 250) (emphasis in original)). When the Court considers a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to

be drawn in [their] favor." *Anderson,* at 255. Yet the Court is not allowed to perform the jury's function – the Court may not weigh evidence, draw legitimate inferences from facts, or decide credibility. *Id.*

If the moving party meets their initial burden, an adverse party may not rest upon the mere allegations or denials of his pleading; his or her response, by affidavits or as otherwise provided in FRCP 56, must set forth specific facts showing there is a genuine issue for trial. FRCP 56(c). The Court may not disregard evidence solely based on its self-serving nature. *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 497 (9th Cir. 2015). "The district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence." *Id.*

1.  Declaration of Norman Winn

In support of the motion for partial summary judgment, the Foundation submitted the Declaration of Norman Winn. Dkt. 90. Winn's declaration was prepared and signed on May 13, 2021. *Id.* On September 17, 2021, The Mountaineers took the deposition of Norman Winn. Dkt. 92, Declaration of Daniel Oats, at ¶ 5.

The Mountaineers contend that they were not made aware of the Declaration of Norman Winn before the deposition and only became aware of the declaration when the Foundation submitted the declaration in support of their motion. Dkt. 126, The Mountaineers' Supplemental Brief, at 1-2. The Foundation argues that the Court should consider the Declaration of Norman Winn under Fed. R. Civ. P. 56(c)(4) because Mr. Winn offered his declaration based on his personal knowledge regarding matters for which he was competent to testify. Dkt. 127, The Foundation's Supplemental Brief, at 3.

On December 31, 2021, Norman Winn passed away. Dkt. 126, The Mountaineers' Supplemental Brief, at 2; Dkt. 127, The Foundation's Supplemental Brief, at 1.

The Court should decline to consider the Declaration of Norman Winn because the content of the declaration contains inadmissible hearsay evidence that cannot otherwise be presented in admissible form at trial. At the summary judgment stage, the Court is not focused on the admissibility of the evidence's form, rather the Court must focus on the admissibility of the evidence's content. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003), *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56."). Thus, even declarations that contain hearsay may be considered at summary judgment if the content could be presented in admissible form at trial. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004).

Under Fed. R. Civ. P. 56(c)(4), the Court will only consider a declaration or affidavit on a motion for summary judgment if the declaration is "made on personal knowledge, set[s] out facts that would be admissible in evidence and show[s] that the affiant or declarant is competent to testify on the matter stated." The Mountaineers does not dispute whether Mr. Winn was competent to testify at the time of the declaration or that the declaration was made based on Mr. Winn's personal knowledge. The question before the Court is whether the declaration's content could be presented in admissible

form at trial. Fed. R. Civ. P. 56(c)(4); *Fonseca*, 374 F.3d at 846; *Fraser*, 342 F.3d at 1036-37.

Mr. Winn's declaration contains hearsay testimony[1] regarding a number of events that occurred between The Mountaineers and the Foundation, as well as his personal experience with both organizations. The Court will consider hearsay evidence only if there is an applicable hearsay exception or if the information could otherwise be presented in admissible form at trial. The Foundation has not identified any hearsay exception that would allow the Court to consider the statements. Additionally, the Foundation has not presented any alternative ways that the evidence could be presented in admissible form at trial.

Based on the foregoing, the Court should not consider the Declaration of Norman Winn when deciding the pending motions for summary judgment.

### 2. The Foundation's Motion for Partial Summary Judgment

#### a. Trademark Licensing -- License Formation

Genuine questions of material fact regarding the formation of a licensing agreement and the existence of mutual assent to the essential terms of a licensing agreement preclude a finding that a valid trademark license exists between the parties. This Court should therefore deny summary judgment on the issue of whether a licensing agreement exists.

A trademark owner may grant a license to use their trademark if the licensee maintains quality control over the goods and services sold under the licensed mark.

---

[1] Inadmissible hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c).

*FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010) (internal quotations omitted). A licensee's properly licensed use of a trademark increases the legal and commercial strength of the licensed mark -- without providing ownership rights in the mark itself to the licensee. 15 U.S.C. § 1055.

Verbal agreements to license a trademark can be an enforceable license. *Watec Co., Ltd. V. Liu,* 403 F.3d 645, 653-54 (9th Cir. 2005). Trademark licenses may be implied by the course of conduct between a trademark holder and licensee. *Department of Parks and Recreation for State of California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1129 (9th Cir. 2006).

Trademark licenses are governed by the ordinary principles of state contract law. *Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1130 (9th Cir. 2006). Under Washington law, a contract need not be in writing to be enforceable -- a contract may be oral or implied. *Weiss v. Lonnquist*, 153 Wn.App. 502, 511 (2009). An implied contract is established when "through a course of dealing and common understanding, the parties show a mutual intent to contract with each other." *Irving Water Dist. V. Jackson P'Ship*, 109 Wn.App. 113, 122 (2001).

The party asserting the existence of an implied contract bears the burden of proving the existence of the contract. *Weiss*, 153 Wn.App. at 511. When the party asserting the existence of an implied contract relies on circumstantial evidence, the circumstances must show it is reasonably certain the parties intended to -- and did -- enter into the agreements. *Goodman v. Darden*, 100 Wn.2d 476, 481 (1983).

The party alleging the existence of a contract must establish: mutual assent and consideration. *In re Marriage of Obaidi*, 154 Wn.App. 609, 616 (2010). Mutual assent

generally takes the form of an offer and acceptance. *Pac. Cascade Corp. v. Nimmer*, 25 Wn.App. 552, 555 (1980). The party asserting an implied contract must establish mutual assent to the essential terms of the contract. *Weiss,* 153 Wn.App. at 511.

Whether the parties manifested mutual assent sufficient to form an implied contract is generally a question of fact. *Hoglund v. Meeks*, 139 Wn.App. 854, 871 (2007). Mutual assent to an agreement may be established based on the circumstances of a transaction – the Court may infer a contract from "a course of dealings between the parties or a common understanding within a particular commercial setting". *Id.*

Joan Hansen, an original incorporator of the Foundation, testified that the Foundation was established as a charitable organization so that donations to The Mountaineers would qualify for a tax deduction. Dkt. 92, Hansen Dep., at 6-10. Ms. Hansen also testified that she originally recommended to The Mountaineers Board of Trustees that the board approve the incorporation of the Foundation, "authorize the use of the name [The Mountaineers] and possibly contribute some Mountaineer funds so the Foundation may commence operation on a tentative basis while awaiting the receipt of the exempt from the IRS." *Id.* at 11; see also, Dkt. 92, Memorandum Re: Proposed Mountaineers Foundation (4/22/1968), at 23. Ms. Hansen stated that every incorporator of the Foundation was a member of The Mountaineers. Dkt. 92, Hansen Dep., at 14.

The Mountaineers also submitted minutes from a Board meeting on May 9, 1968, which state:

> Joan Hansen, Chairman of the Legal Committee, submitted a resolution to establish The Mountaineers Foundation along with a copy of the Articles of Incorporation and the proposed By-laws of The Foundation (copy attached to the official minutes). It was moved and seconded (Hazle, Latz) that the Board of The Mountaineers approve formation of the Foundation

and authorize and approves use of the name "Mountaineers" by the Foundation."

Dkt. 92, The Mountaineers Board of Trustee Minutes (05/09/1968), at 24-25.

The Foundation cites to the Declaration of Paul Robisch, a former member of The Mountaineers' Board of Trustees. Mr. Robisch stated that during his time on the Board of Trustees, he was not aware of any discussions regarding the Foundation's ability to use the Mountaineers' name. Dkt. 114, Delcaration of Paul Robisch, at ¶ 18. Mr. Robisch expressed that it was his belief that The Mountaineers intended to provide the Foundation with unconditional permission to use and own the Mountaineers Foundation name. *Id.*

Based on the record, it appears that in 1968 The Mountaineers Board of Trustees agreed to form the Foundation and authorize the use of the name, The Mountaineers. However, it is unclear whether The Mountaineers and the Foundation ever formalized a licensing agreement. To establish the existence of a licensing agreement, The Mountaineers would need to establish mutual assent between The Mountaineers and the Foundation as to the essential terms regarding the license and the use of the "Mountaineers."

Although the record indicates that The Mountaineers and the Foundation operated cooperatively for many years, the record contains conflicting testimony regarding the existence of a licensing agreement, any alleged essential terms, and the effect of any such licensing agreement. See, Dkt. 92, Deposition of Joan Hansen, at 5-27; Dkt. 92, Deposition of the Foundation, at 29-70; Dkt. 92, Deposition of Paul Robisch, at 93-102. The Court cannot, on a motion for summary judgment, decide issues of fact by weighing evidence, drawing legitimate inferences from facts or deciding credibility.

1    The Court should find that genuine questions of fact preclude a finding that an

2    enforceable licensing agreement existed between The Mountaineers and the

3    Foundation.

4        b.  Whether a Trademark is Generic

5        The Mountaineers alleges ownership of the 305 Mark (THE MOUNTAINEERS)

6    and the 474 Application (THE MOUNTAINEERS FOUNDATION). Dkt. 38, The

7    Mountaineer's Second Amended Answer and Counterclaim, at 15-16. The

8    Mountaineers' counterclaims raise causes of action based on the Foundation's use of

9    MOUNTAINEERS FOUNDATION. *Id.* at 23-27. The Foundation argues the Court

10   should dismiss The Mountaineers first six causes of action because the 474 Application

11   (THE MOUNTAINEERS FOUNDATION), 305 Mark (THE MOUNTAINEERS word mark)

12   and 307 Mark (THE MOUNTAINEERS design mark) are generic and unenforceable.

13   Dkt. 87, Motion for Partial Summary Judgment.

14       The Mountaineers' federally-registered marks are entitled to a strong

15   presumption of enforceability and validity. The Foundation has not met its burden of

16   establishing that the Mountaineer marks are generic when applied to the specific

17   services at issue in this litigation.

18       (i)  Affirmative Defense

19       The Mountaineers argue that the Court should decline to consider the

20   Foundation's argument regarding genericism because the Foundation did not identify

21   genericism as an affirmative defense. Dkt. 109 at 24-25.

22       Genericism is an affirmative defense that must be raised in a party's responsive

23   pleading to a complaint. *General Conference of Corp. of Seventh-Day Adventist v.*

24

25

1   *Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 231 (9th Cir. 1989)

2   (Holding that the defendant's answer sufficiently raised the issue of genericism as an

3   affirmative defense). Affirmative defenses must be raised in an initial responsive

4   pleading with sufficient specificity to give the plaintiff fair notice of the defense. *Garcia v.*

5   *Salvation Army*, 918 F.3d 997, 1008 (9th Cir. 2019).

6      An unpled affirmative defense can only be raised on a motion for summary

7   judgment when consideration of the defense would not prejudice plaintiff. *Id.* When an

8   affirmative defense would have been dispositive if asserted when the action was filed,

9   the consideration of the defense does not prejudice the plaintiff. *Id.* The party opposing

10  consideration of the affirmative defense must point to a tangible way it will be prejudiced

11  by consideration of the defense. *Id.*

12     The Foundation's Answer and Affirmative Defenses to Defendant's Second

13  Amended Counterclaims does not specifically raise the affirmative defense of

14  genericism. Dkt. 41, at 8-10. The Foundation cites to their fifth affirmative defense,

15  which asserts, ". . .Counterclaim Plaintiff has no valid protectable mark in which it enjoys

16  any rights that may be asserted against The Foundation". Dkt. 41 at 9, ll. 14-16. The

17  Foundation contends the fifth affirmative defense gave The Mountaineers sufficient

18  notice that the Foundation would raise a genericism defense. Dkt. 118. This cited

19  affirmative defense is too general to give The Mountaineers sufficient fair notice that the

20  Foundation would be raising the defense of genericism. *Garcia*, 918 F.3d at 1008 ("But

21  simply stating that the plaintiff failed to state a claim is insufficient to provide notice of a

22  specific affirmative defense.").

23

24

25

1    Yet, the Court should consider the Foundation's defense of genericism because

2    consideration of the defense will not prejudice The Mountaineers. To prevail on their

3    claim of trademark infringement, The Mountaineers must demonstrate they hold an

4    ownership interest in a protectable mark. *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th

5    1150, 1159 (9th Cir. 2021). Trademarks are classified into one of five categories of

6    increasing distinctiveness with corresponding increasing protection: "(1) generic, (2)

7    descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Id.* at 1162. Generic marks are

8    ineligible for trademark protection. *Id.* Even if genericism was not raised as an

9    affirmative defense, The Mountaineers still have the burden of establishing the

10   distinctiveness and enforceability of their alleged marks.

11   Because the distinctiveness and enforceability of The Mountaineers' marks is a

12   dispositive issue in this action subject to discovery, consideration of the Foundation's

13   genericism defense will not prejudice The Mountaineers. The Court should consider the

14   Foundation's genericism affirmative defense.

15   ii.    Judicial Estoppel

16   The Mountaineers argues that the doctrine of judicial estoppel prevents the

17   Foundation from arguing that The Mountaineers' trademarks are generic. Dkt. 109 at

18   23-24. The Mountaineers contends that the Foundation should be estopped because

19   their position in the complaint – that "Mountaineers" is distinctive as applied to the

20   Foundations' services – is inconsistent with the Foundations' current position – that

21   "Mountaineers" is generic as applied to The Mountaineers' services. *Id.*

22   The doctrine of judicial estoppel is an equitable doctrine preventing a party from

23   prevailing in one phase of a case on an argument and then relying on a contradictory

24

25

REPORT AND RECOMMENDATION - 14

argument to prevail in a different phase or litigation. *Zedner v. United States*, 547 U.S. 489, 504 (2006). This doctrine applies when a party succeeds in persuading "a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170 (2010).

The Court has not made any finding regarding the distinctiveness or enforceability of the Foundations' marks. The Foundations' position that "Mountaineers" is generic as to some goods or services, therefore, is not inconsistent with any prior judicially-accepted position. The Court should not apply the doctrine of judicial estoppel concerning the Foundation's argument that The Mountaineers' marks are generic.

iii.     Licensee Estoppel

The Mountaineers argues that the doctrine of licensee estoppel precludes the Foundation from challenging the validity of The Mountaineers' trademarks.

The doctrine of licensee estoppel precludes a licensee from challenging the validity of the licensor's trademark based on conduct that occurred during the life of the license, particularly with respect to the licensee itself. *Pacific Supply Coop. v. Farmers Union Cent. Exch.*, 318 F.2d 894, 908 (9th Cir, 1963). Based on the analysis above, of whether a licensing agreement was formed, genuine questions of material fact prevent a finding as a matter of law that a licensing agreement existed, or that the doctrine of licensee estoppel applies to this litigation.

iv.     Genericness

To prevail on a trademark infringement claim, the party claiming trademark infringement must demonstrate that (1) it has a protected ownership interest in the mark

1    and (2) that the alleged infringing use is likely to cause consumer confusion. *Pom*

2    *Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014). The registration of a

3    mark is prima facie evidence of the mark's validity, the registrant's ownership of the

4    mark, and "the registrant's exclusive right to use the registered mark in commerce on or

5    in connection with the goods or services specified in the registration subject to any

6    conditions or limitations stated therein." 15 U.S.C. § 1115(a).

7        "Although the plaintiff in a trademark action bears the ultimate burden of proof

8    that his or her mark is valid, federal registration provides prima facie evidence of the

9    mark's validity and entitles the plaintiff to a strong presumption that the mark is a

10    protectable mark." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114

11    (9th Cir. 2010) (internal quotations omitted). When a party establishes that a mark has

12    been properly registered, the burden shifts to the opposing party to show by a

13    preponderance of the evidence that the mark is not protectable. *VIP Prods. LLC v. Jack*

14    *Daniel's Props.*, 953 F.3d 1170, 1174 (9th Cir. 2020); *Zobmondo*, 602 F.3d 1114.

15        Whether a trademark is generic is a question of fact requiring an evaluation of

16    relevant evidence to determine consumer understanding. *Yellow Cab Co. v. Yellow Cab*

17    *of Elk Grove, Inc.*, 419 F.3d 925, 929 (9th Cir. 2005). Due to the intensely factual nature

18    of trademark disputes, summary judgment is generally disfavored. *Soc. Techs., LLC v.*

19    *Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021).

20        Trademarks are classified into one of five categories of increasing distinctiveness

21    with corresponding increasing protection: "(1) generic, (2) descriptive, (3) suggestive,

22    (4) arbitrary, and (5) fanciful." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1162

23    (9th Cir. 2021). Generic marks are ineligible for trademark protection. *Id.* Genericness

24

25

REPORT AND RECOMMENDATION - 16

1    alone is sufficient grounds to cancel a trademark. *Park 'N Fly, Inc v. Dollar Park & Fly,*

2    *Inc.*, 469 U.S. 189, 194 (1985).

3        A mark is generic when consumers understand the word to refer to a particular

4    good or service, regardless of its source. *Elliott v. Google, Inc.*, 860 F.3d 1151, 1156

5    (9th Cir. 2017); *Advertise.com, Inc. v. AOL Adver., Inc.*, 616 F.3d 974, 977 (9th Cir.

6    2010). "The mere fact that the public sometimes uses a trademark as the name for a

7    unique product does not immediately render the mark generic … a trademark only

8    becomes generic when the 'primary significance of the registered mark to the relevant

9    public' is as the name for a particular type of good or service irrespective of its source."

10   *Elliott*, 860 F.3d at 1156 (quoting 15 U.S.C. § 1064(3)).

11       The Ninth Circuit uses the "who-are-you/what-are-you" test when determining

12   whether a trademark is generic. *Elliott*, 860 F.3d at 1156 (citing *Yellow Cab Co.*, 419

13   F.3d at 929). A mark is generic when the relevant public understands the mark as

14   describing "what" the particular good or service is. *Id.*

15       Conversely, a mark is not generic when it describes the source or provider, from

16   which the particular good or service comes. *Id.* To show that a trademark is generic, the

17   party alleging genericism must show that the trademark is generic as applied to each

18   particular product or service. *Id.* at 1157 (acknowledging that a trademark can be valid

19   and protectable as to one particular good or service while simultaneously being

20   unenforceable for a different particular good or service); *Advertise.com, Inc.*, 616 F.3d

21   at 977 ("Context is critical to a distinctiveness analysis … [and the level of

22   distinctiveness of a mark] can be determined only be reference to the goods or services

23   that [the mark] identifies.") (alterations in original).

24

25

REPORT AND RECOMMENDATION - 17

It is undisputed that The Mountaineers have federal registrations for the 305 Mark (THE MOUNTAINEERS word mark) and the 307 Mark (THE MOUNTAINEERS design mark). The Mountaineers therefore are entitled to a strong presumption that the marks are valid and enforceable, and the Foundation bears the burden of establishing that the marks are generic. *VIP Prods. LLC v. Jack Daniel's Props.*, 953 F.3d 1170, 1174 (9th Cir. 2020); *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114 (9th Cir. 2010).

To prevail on genericism, the Foundation must establish that the term "Mountaineers" is generic for services related to:

- Charitable fundraising services for the environment;
- Conservation;
- Outdoor education;
- Outdoor recreation;
- Natural history; and
- Books in the field of environmental conservation.

Dkt. 95, Federal Trademark Registration for 968 Mark, at 72-74 (Exhibit 11); Dkt. 38. Federal Trademark Registration for 305 Mark, at 39-41 (Exhibit 2); Dkt. 95-1, Federal Trademark Registration for 307 Mark, at 69-70 (Exhibit 11).

The Foundation can do this by presenting evidence of: "(1) generic use by competitors of the mark that has not been contested by the owner of the mark; (2) generic use of the trademark by proponent of the trademark; (3) dictionary definition to determine public usage; (4) generic use in the media of the trademark, such as in trade

REPORT AND RECOMMENDATION - 18

1    journals and newspapers; (5) testimony of persons in the trade; and (6) consumer

2    surveys." *Bluetooth Sig, Inc. v. FCA United States LLC*, 463 F. Supp. 3d 1169, 1185

3    (W.D. Wash. 2020).

4        The Foundation cites to deposition testimony that the term "mountaineer" can

5    refer to a person that climbs mountains and that members of The Mountaineers

6    sometimes refer to themselves as "Mountaineers." Dkt. 88-1, Deposition of Vogl, at 393-

7    95; Dkt. 88-1, Deposition of Polglase, at 286; Dkt. 88-1, Deposition of Hsue, at 1093.

8    The former president of The Mountaineers testified that the organization named itself

9    The Mountaineers because people interested in mountaineering founded it. Dkt. 88-1,

10    Deposition of Geoffrey Lawrence, at 744.

11        The Foundation also cites to a number of dictionary entries that define the term

12    "mountaineer" as a person who climbs mountains, and internet articles using the term

13    "mountaineers" to describe a person who climbs mountains. Dkt. 87 at 7-8.

14        Yet, trademarks must be analyzed in the context of the service for which the

15    trademark is used. To show that a trademark is generic, the party alleging genericism

16    must show that the mark is generic as applied to a particular good or service. *Elliott v.*

17    *Google, Inc.*, 860 F.3d 1151, 1157 (9th Cir. 2017) ("a claim of genericide or genericism

18    must be made with regard to a particular type of good or service.").

19        Therefore, to show that The Mountaineer trademarks are generic, the Foundation

20    would need to show the term "Mountaineer" is generic when applied to -- charitable

21    fundraising services for the environment; conservation; outdoor recreation; outdoor

22    education; natural history; and books in the field of environmental conservation. That

23    "mountaineer" has a general definition, widely used in publications, does not render the

24

25

1  term generic when applied to the goods or services at issue in this litigation. The

2  Foundation's cited evidence does not establish that the relevant public would

3  understand "Mountaineers" to be the name of the goods or services provided by The

4  Mountaineers.

5      Additionally, the evidence cited by the Foundation indicates that members of The

6  Mountaineers refer to themselves – the source or providers of the services – as

7  "Mountaineers," but they do not use that term to refer to the goods or services they

8  provide. This weighs in favor of a finding that "Mountaineers," as used by The

9  Mountaineers is not generic because the term refers to the source (persons providing

10  the service) of the service rather than the service itself.

11      Next, the Foundation cites to evidence that other organizations use the term

12  "mountaineers" in their name and that The Mountaineers have not taken steps to

13  enforce their marks against: The Big City Mountaineers, The Spokane Mountaineers,

14  The Vermont Mountaineers, The Mountaineers at Ohio State, The Southern California

15  Mountaineers Association, The Connecticut Climbers and Mountaineers, The

16  Mountaineers Club of Alaska, and the West Virginia Mountaineers. Dkt. 88-1,

17  Deposition of William Ashby, at 1839; Dkt. 88-1, Deposition of Vogl, at 849, 863-64,

18  868-69, 872-73, 879-80, 885, 888-89, 892; Dkt. 88-1, Deposition of Polglase, at 271,

19  279-80, 284, 286-87, 289, 290, 291, 292; Dkt. 88-1, Deposition of Lawrence, at 721-22,

20  729, 731, 732-33, 735, 737, 738, 739.

21      If a trademark owner has not sued other alleged infringers, this does not

22  constitute a defense to trademark infringement. 3 McCarthy on Trademarks and Unfair

23  Competition § 17:17. A trademark owner would lose trademark rights through non-

24

25

1    enforcement only if third party uses cause the trademark to lose its significance as an

2    indication of origin. *Woodstock's Enterprises, Inc. (California) v. Woodstock's*

3    *Enterprises, Inc (Oregon)*, 43 U.S.P.Q.2d 1440 at *7 (T.T.A.B. 1999) (quoting *Wallpaper*

4    *Manufacturers, Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 765 (CCPA 1982)).

5           The Foundation has not identified what goods or services these alleged third

6    party users provide or whether they use "mountaineer" to identify any good or service.

7    The fact that other third parties use an alleged mark is insufficient, without further

8    factual development, to show that a trademark has become generic. The Foundation

9    would need to establish that third party use of "mountaineers" has caused consumers to

10   understand the word "mountaineers" to refer to each of the particular services provided

11   by The Mountaineers regardless of source. The Foundation does not identify any

12   evidence in the record showing that third party use of "mountaineers" has caused it to

13   become generic for any particular service.

14          The Court should find that no genuine disputes of material fact remain regarding

15   whether relevant public would understand "Mountaineer" to be generic for -- charitable

16   fundraising services for the environment; conservation; outdoor recreation; outdoor

17   education; natural history; and books in the field of environmental conservation. The

18   undisputed evidence in the record shows that The Mountaineers has federal

19   registrations for their trademarks and enjoys a strong presumption that their marks are

20   valid and enforceable. The Foundation has not met its burden of rebutting this

21   presumption by providing evidence that the term "mountaineers" is generic when

22   applied to each of the particular goods or services provided by The Mountaineers.

23   Therefore, the Court should grant summary judgment in favor of The Mountaineers

24

25

1   finding that The Mountaineers' trademarks are not generic for charitable fundraising

2   services for the environment; conservation; outdoor recreation; outdoor education;

3   natural history; and books in the field of environmental conservation.

4       **c.  The Mountaineers' Cross-Motion for Summary Judgment -- Trademark**

5           **Infringement**

6       The Mountaineers has filed a cross-motion for summary judgment arguing that

7   the Court should find that The Mountaineers has a valid, protectable interest in the

8   Mountaineers' trademarks and that the Foundation's continued use of these trademarks

9   is likely to cause consumer confusion. Dkt. 91 at 18-27.

10      To succeed on their claim of trademark infringement, The Mountaineers must

11  demonstrate that they hold a protectable ownership interest in a protectable mark and

12  that the Foundation's continued use is likely to cause consumer confusion, mistake, or

13  is likely to deceive. *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1159 (9th Cir.

14  2021); *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).

15       The Mountaineers made a prima facie showing that they own a protected

16  ownership interest in The Mountaineers trademarks and the Foundation has not

17  rebutted the presumption of validity. As discussed below, determining whether a

18  likelihood of confusion exists is a fact-intensive inquiry that requires weighing all

19  relevant facts and circumstances concerning the trademarks at issue. The Court should

20  deny The Mountaineers' cross-motion for summary judgment on the issue of trademark

21  infringement because genuine questions of material fact remain regarding likelihood of

22  confusion.

23

24

25

1

    i.  Protected Ownership Interest

2      The registration of a mark is prima facie evidence of the mark's validity, the

3   registrant's ownership of the mark, and exclusive right to use the mark in connection

4   with the goods or services specified in the registration. 15 U.S.C. § 1115(a). "When

5   proof of registration is uncontested, the ownership interest element of a trademark

6   infringement claim is met." *Pom Wonderful LLC*, 775 F.3d at 1124. Once a party

7   establishes ownership of a registered mark the burden shifts to the opposing party to

8   show by a preponderance of evidence that the mark is not protectable. *VIP Prods. LLC*,

9   953 F.3d at 1174.

10      It is undisputed that The Mountaineers has federal registrations for the 305 Mark

11  (THE MOUNTAINEERS word mark),307 Mark (THE MOUNTAINEERS design mark)

12  and 968 Mark (MOUNTAINEERS BOOKS word mark). Accordingly, The Mountaineers

13  enjoys a strong presumption that the marks are valid and enforceable. This is sufficient

14  evidence to establish the first element of trademark infringement unless the Foundation

15  can rebut the presumption of validity.

16          a.  Whether a Trademark is Generic

17      The Foundation responds to The Mountaineers' summary judgment motion on

18  the issue of enforceability by arguing that The Mountaineers' trademarks are

19  unprotectable generic marks. Dkt. 108 at 11-12.

20      There is a strong presumption that THE MOUNTAINEERS marks are valid and

21  enforceable based on the marks' federal registration. *VIP Prods. LLC v. Jack Daniel's*

22  *Props.*, 953 F.3d 1170, 1174 (9th Cir. 2020). And, the Court applies a presumption that

23  the marks are inherently distinctive -- because the USPTO did not require proof of

24

25

REPORT AND RECOMMENDATION - 23

1    secondary meaning to register the marks. *Zobmondo Entm't, LLC v. Falls Media, LLC*,

2    602 F.3d 1108, 1113 (9th Cir. 2010).

3          The Foundation relies on the same evidence presented in their motion for partial

4    summary judgment to support their argument in response to The Mountaineer's cross-

5    motion, that the term, "Mountaineers", is generic. As discussed in Section C.2.b.iv, pp.

6    15-22, above, this evidence does not establish whether the relevant purchasing public

7    understands the primary significance of "Mountaineer" to be any of the services

8    provided by The Mountaineers. The Foundation has not produced sufficient evidence to

9    support summary judgment on its affirmative defense as a matter of law, that the term

10   "Mountaineers" is generic as applied to The Mountaineers' identified services. The

11   Court should grant summary judgment in favor of The Mountaineers, finding that The

12   Mountaineers trademarks are not generic for charitable fundraising services for the

13   environment, conservation, outdoor recreation, outdoor education, natural history, and

14   books in the field of environmental conservation.

15                    b.   Abandonment – Charitable Fundraising Services

16         The Foundation also argues the Court should deny summary judgment to the

17   Mountaineers, on the issue of whether The Mountaineers abandoned their rights in the

18   "Mountaineer" trademarks. Dkt. 108, Foundation's Opposition to Mountaineers' Motion

19   for Summary Judgment, at 12-17. Based on the following analysis, the Court should find

20   that the Foundation has not rebutted the presumptive validity and enforceability of The

21   Mountaineers' marks with respect to charitable fundraising activities. The Mountaineers'

22   summary judgment motion should be granted with respect to the allegation that the

23   Mountaineers abandoned the trademarks for purposes of charitable fundraising

24

25

services, because there are no genuine disputes of material fact on this issue. The Court should strike the Foundation's Sixth Affirmative Defense with respect to charitable fundraising activities, because no genuine issues of fact remain as to the issue of trademark abandonment (regarding non-use, and regarding non-enforcement) concerning this service.

Whether an owner has abandoned a trademark is an issue of fact. *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985). The party asserting abandonment must strictly prove abandonment because abandonment amounts to a *forfeiture* of trademark rights. *Prudential Ins. Co. of America v. Gibraltar Financial Corp. of California*, 694 F.2d 1150, 1156 (9th Cir. 1982). The Ninth Circuit has not determined "whether this high standard of proof requires 'clear and convincing' evidence or a "preponderance of the evidence."" *FreeCycleSunnyvale*, 626 F.3d at 514 (quoting *Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 935 n.2 (9th Cir. 2006)). Under either standard, and viewing evidence in light most favorable to the non-moving party – here, the Foundation -- the record indicates that no genuine dispute of material facts remain regarding the issue of abandonment.

Under the Lanham Act, a trademark would be deemed abandoned when (1) the owner of the mark discontinues use of the mark with intent to not resume such use, or (2) the owner's course of conduct, including acts of omission, cause the mark to become the generic name for the good or service. 15 U.S.C. § 1127.

i.   Abandonment – Non-Use

To show abandonment by non-use, the party claiming abandonment must prove the trademark owner: (1) discontinued use of the trademark, and (2) did so with an

intent to not resume such use. *Grocery Outlet Inc., v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007). Intent to not resume use may be inferred from circumstances. 15 U.S.C. § 1127.

"Use" of a mark "means bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. Non-use for three consecutive years creates a rebuttable presumption and constitutes prima facie evidence of abandonment. *Id.*; *Herb Reed Enter., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1247-48 (9th Cir. 2013); *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1397-1398 (9th Cir. 1985). The presumption of abandonment by non-use "may be rebutted by showing valid reasons for nonuse or by proving lack of intent to abandon." *Id.*

The evidentiary standard for non-use is high because it requires a complete cessation or discontinuance of trademark use. *Id.* The type and quantity of use required to constitute use in the "ordinary course of trade" depends on the industry and type of marketing to which the mark is applied. *Electro Source, LLC v. Brandess-Kalt-Aetna Group Inc.*, 458 F.3d 931, 940 (9th Cir. 2006); *Herb Reed Enter., LLC*, 736 F.3d at 1248 ("Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith.") (quoting *Carter-Wallace, Inc., v. Procter & Gamble Co.*, 434 F.2d 794, 804 (9th Cir. 1970)).

The Foundation confines its argument to a contention that The Mountaineers has abandoned their trademark rights for charitable fundraising services. Dkt. 108 at 13-14. Accordingly, the Court's abandonment analysis should be limited to charitable fundraising services.

1    Tom Vogl testified that The Mountaineers has accepted tax deductible donations

2    since it became a 510(c)(3) organization in April 2011, but did not accept tax deductible

3    gifts before that. Dkt. 88-1, Deposition of Vogl, at 833-34. Mr. Vogl stated that The

4    Mountaineers accepted charitable donations before becoming a 501(c)(3) organization

5    – but, these donations would not have qualified as tax deductible. Dkt. 95, Declaration

6    of Tom Vogl, at ¶ 4.

7    William Ashby testified that before becoming a 501(c)(3) organization, "The

8    Mountaineers itself wasn't created in a format that could receive donations. And so a

9    separate nonprofit was created that could receive donations on behalf of The

10    Mountaineers." Dkt. 88-1, Deposition of William Ashby, at 1886.

11    Relying on this evidence, the Foundation argues that because The Mountaineers

12    was a 501(c)(4) organization from 1977 to 2011, The Mountaineers could not receive

13    tax deductible donations and thus ceased charitable fundraising activities until 2011.[2]

14    Unlike 501(c)(3) organizations, donations to 501(c)(4) organizations are not tax

15    deductible. *FEC v. Beaumont*, 539 U.S. 146, 150 n. 1 (2003).

16    501(c)(4) organizations are allowed to fundraise and receive charitable

17    donations. *Id.* The Mountaineers status as a 501(c)(4) organization did not prohibit the

18    receipt of donations, but the donations were not allowed as a tax deduction. Mr. Vogl

19    and Delmar M. Fadden both stated that The Mountaineers received non-tax-deductible

20

21

22    [2] The Foundation also contends that The Mountaineers "as originally incorporated, ceased to exist upon its 2011 merger" which the Foundation argues shows that The Mountaineers abandoned their marks since at least 2011. Dkt. 108 at 14. This argument is unpersuasive because the registered owner of a trademark includes the registrant's successors and assigns. 15 U.S.C. § 1127; 3 McCarthy on Trademark and Unfair Competition § 18:15 (explaining that successors and assigns of a trademark owner benefit from the continuity of the mark and step into the shoes of the predecessor).

23

24

25

REPORT AND RECOMMENDATION - 27

1    donations before The Mountaineers became a 501(c)(3) organization. Dkt. 93,

2    Declaration of Delmar M. Fadden, at ¶ 15; Dkt. 95, Declaration of Tom Vogl, at ¶ 4.

3    　　　Even if the Court were to assume The Mountaineers did not, or could not have,

4    accepted donations before The Mountaineers became a 501(c)(3) organization, the

5    record indicates that The Mountaineers continued to participate in charitable fundraising

6    by encouraging donors who intended to give to the Mountaineers to direct their

7    donations to the Foundation – and it is uncontested the Foundation was an entity

8    created to accept such donations. Dkt. 92, Deposition of Joan Hansen ("Hansen Dep.")

9    at 7, 9, 10, 16.

10    　　　The record indicates that The Mountaineers and the Foundation worked

11    cooperatively to solicit memberships and donations to the Foundation. Dkt. 95, Letter

12    from Virginia Felton to Thomas Allen (11/2/1992), at 21; Dkt. 95, Joint Donation

13    Solicitation (5/27/1994), at 22-28; Dkt. 93, Declaration of Delmar M. Fadden, at ¶ 15

14    ("Instead, we encouraged our members to make donations to the Foundation because

15    those donations were tax deductible, and the Foundation was actively working to

16    promote The Mountaineers' conservation and environmental objectives and goals.); Dkt.

17    88, Deposition of William Ashby, at 1886 ("My understanding is before The

18    Mountaineers was a 501(c)(3), The Mountaineers itself wasn't created in a format that

19    could receive donations. And so a separate nonprofit was created that could receive

20    donations on behalf of The Mountaineers.").

21    　　　Accordingly, there is no genuine dispute of material fact; uncontroverted

22    evidence in the record indicates that The Mountaineers continued to provide charitable

23    fundraising services while being designated a 501(c)(4) organization. The Foundation

24

25

has failed to meet its burden of strictly proving that The Mountaineers discontinued the use of their marks with an intent to not resume such use. Therefore, the Court should grant summary judgment in favor of The Mountaineers finding that The Mountaineers has not abandoned through non-use, as to its trademark rights for charitable fundraising services.

  ii. <u>Abandonment – Non-Enforcement</u>

If a trademark owner has not sued other alleged infringers, this does not constitute a defense to trademark infringement. 3 McCarthy on Trademarks and Unfair Competition § 17:17. A trademark owner is not obligated to immediately sue all possible infringers and may take a legitimate cost-effective litigation strategy. *Id*; *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006) (holding that a trademark owner is not obligated to enforce a trademark until the right to protection has ripened and plaintiff has a provable claim of infringement). A trademark is only abandoned through non-enforcement when the trademark "loses its significance as an indication of origin, not the sole identification of source." *Woodstock's Enterprises, Inc. (California) v. Woodstock's Enterprises, Inc (Oregon)*, 43 U.S.P.Q.2d 1440 at *7 (T.T.A.B. 1999) (quoting *Wallpaper Manufacturers, Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 765 (CCPA 1982)).

To establish abandonment through non-enforcement, the Foundation would need to prove that because of The Mountaineers' non-enforcement, the marks have: (1) become the generic name for the goods or services for which the mark is used, or (2) lost their significance as a trademark. 15 U.S.C. § 1127.

The Foundation argues that The Mountaineers has abandoned their trademark rights because The Mountaineers failed to police alleged third-party infringing uses. This alone is insufficient to demonstrate abandonment.

The record does not indicate the goods or services to which these alleged third-party infringers applied the term "mountaineers". Additionally, there is no evidence in the record regarding when these alleged third parties began using the term "mountaineers", whether they use "mountaineers" as a source identifier, or whether there would be any confusion between these alleged third-party users and The Mountaineers. The Foundation has not provided sufficient evidence to show that these alleged third party uses triggered The Mountaineers' obligation to enforce their trademarks against the users. *See, Tillamook Country Smoker, Inc.*, 465 F.3d at 1108 (holding that a trademark owner is not obligated to enforce a trademark until the right to protection has ripened and plaintiff has a provable claim of infringement). Additionally, the Foundation has failed to present evidence that The Mountaineers' marks have become generic for charitable fundraising services *because* of The Mountaineers' alleged failure to police third party uses.

The Court should GRANT summary judgment in favor of The Mountaineers on this issue, finding that The Mountaineers have not abandoned their trademarks -- concerning the activity of charitable fundraising -- through non-enforcement.

2.  Likelihood of Confusion

To determine likelihood of confusion, courts consider: (1) the strength of the mark; (2) proximity or relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods or

services and the degree of care likely to be exercised by the purchaser; (7) the

defendant's intent in selecting the mark; and (8) the likelihood of expansion of product

lines. *JL Bev. Co., LLC v. Jim Beam Brands, Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016)

(citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), *abrogated in

part on other grounds by Mattel, Inc v. Walking Mountain Prods.*, 353 F.3d 792, 810 (9th

Cir. 2003)). These factors are an analytical guide that are neither exhaustive nor

dispositive. *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021).

The party alleging infringement need not satisfy every factor, the totality of the

circumstances must be considered to determine whether a likelihood of confusion

exists. *Pom Wonderful LLC*, 775 F.3d at 1125. Due to the fact-intensive inquiry

necessary to evaluate each of these factors, summary judgment on likelihood of

confusion grounds is generally disfavored. *JL Bev. Co. LLC*, 828 F.3d at 1105.

### a. Strength of the Mark

As discussed above, trademarks are classified into one of five categories of

increasing distinctiveness and protection: (1) generic, (2) descriptive, (3) suggestive, (4)

arbitrary, and (5) fanciful. *Ironhawk Techs., Inc.*, 2 F.4th at 1162. The most distinctive

marks – arbitrary and fanciful – are entitled to the most protection, while generic marks

receive no protection. *Pom Wonderful LLC*, 775 F.3d at 1126. "Suggestive and

descriptive marks lie between these two extremes, with suggestive marks being entitled

to greater protection than descriptive marks." *Id.* When the Patent and Trademark Office

issues a trademark registration without requiring proof of secondary meaning, the

federal registration is prima facie evidence of inherent distinctiveness (i.e. at least

suggestive). *Ironhawk Techs., Inc.*, 2 F.4th at 1162. Alleged infringers can rebut this presumption. *Id.*

"Descriptive marks define a particular characteristic of the product in a way that does not require any imagination." *Ironhawk Techs., Inc.*, 2 F.4th at 1162 (internal citation omitted). Suggestive marks "suggest a product's features and require consumers to exercise imagination to associate the suggestive mark with the product." *Id.* The distinction between descriptive and suggestive marks is a question of fact. *Id.* Although stronger than generic or descriptive terms, suggestive marks are still presumptively weak. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir. 2014).

Descriptive and suggestive marks can be strengthened by evidence of actual marketplace recognition, extensive advertisement, and length of exclusive use. *Id.* (citing *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). A failure to enforce a trademark can weaken a trademark when similar marks for similar goods and services crowd the relevant market without enforcement. 3 McCarthy on Trademarks and Unfair Competition § 17:17.

The Mountaineers argues that The Mountaineers' trademarks should be categorized at least in the suggestive group, and have become strong marks by virtue of continuous use since 1907. Dkt. 91 at 24-25; Dkt. 16 at 9. The Foundation argues that The Mountaineers trademarks are generic, or -- in the alternative -- descriptive. Dkt. 108 at 18. Genuine questions of material fact preclude a finding in favor of either party on this factor because a finder of fact would need to weigh the relevant evidence and circumstances to determine the strengths of The Mountaineers trademarks.

For the reasons discussed in Section C.2.b.iv., pp. 15-21, of this Report and Recommendation, the Court should find that The Mountaineers' trademarks are not generic. Yet, the Foundation has presented evidence that other organizations exist using the word "Mountaineers" as a tradename. It is not clear from the record whether these organizations operate within the same relevant market as The Mountaineers. Questions of fact remain regarding the impact of these other users on the strength of The Mountaineers trademarks.

Neither party has presented evidence regarding how the relevant purchasing public would understand The Mountaineers trademarks. Although The Mountaineers allege use since 1907, there is no evidence in the record for summary judgment purposes, regarding the impact of advertising or public recognition sufficient to strengthen their mark.

b. Proximity or Relatedness of the Goods or Services

"Goods or services that are closely related are generally more likely than unrelated goods or services to confuse the public as to their sources." *La Quinta Worldwide LLC v. Q.R.T.M., S.A de C.V.*, 762 F.3d 867, 875 (9th Cir. 2014). Goods and services are related when "they are complementary, sold to the same class of purchaser, or similar in use and function." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1163 (9th Cir. 2021). The parties need not be direct competitors, as long as the services are so similar that the purchasing public would reasonably believe that they come from the same source if sold under the same mark. *Pom Wonderful LLC*, 775 F.3d at 1127.

1    This factor weights in favor of likelihood of confusion because the parties provide

2    identical services – charitable fundraising services directed at environmental

3    conservation. Dkt. 88-1, 1985 Conservancy Agreement, at 110; Dkt. 95, The

4    Mountaineers' Articles of Incorporation, at 14; Dkt. 1-1, The Foundation's Articles of

5    Incorporation, at 8-13.

6            c.  Similarity of the Marks

7    When determining the similarity of the marks, the Court considers the following

8    principles: (1) similarities are best determined by appearance, sound and meaning, (2)

9    marks must be considered in their entirety as they appear in the marketplace, and (3)

10   similarities are weighed more heavily than differences. *Ironhawk Techs., Inc. v.*

11   *Dropbox, Inc.*, 2 F.4th 1150, 1164 (9th Cir. 2021). "The amount of similarity required to

12   support a likelihood of confusion declines as the services themselves become

13   increasingly similar." *La Quinta Worldwide LLC*, 762 F.3d at 876.

14   The marks in dispute in this litigation are THE MOUNTAINEERS and THE

15   MOUNTAINEERS FOUNDATION. These trademarks are nearly identical. The only

16   difference is the addition of the word "FOUNDATION" to one of the marks. The

17   Foundation does not contest the issue and appears to agree the marks are similar and

18   applied to identical services. This factor weighs in favor of likelihood of confusion.

19           d.  Evidence of Actual Confusion

20   Evidence of actual consumer confusion weighs strongly in favor of a finding of

21   likelihood of confusion. *Ironhawk Techs., Inc.*, 2 F.4th at 1165. Because of the difficulty

22   in gathering direct evidence of confusion, this factor is only considered when there is

23

24

25

1   evidence of past confusion or when circumstances indicate that such evidence is

2   available. *Id.* The failure to provide instances of actual confusion is not dispositive. *Id.*

3       In 2019, Judy Sterry sent a $6,000 check to the Foundation. Dkt. 92, Deposition

4   of the Foundation, at 33. Ms. Sterry subsequently contacted the Foundation to inform

5   the Foundation that she had intended for the money to go to The Mountaineers. *Id.* The

6   Foundation refunded the donation. *Id.* The Foundation has submitted evidence that

7   before Judy Sterry made the donation, she contacted the Foundation and the

8   Foundation provided information explaining that The Mountaineers and the Foundation

9   were separate entities. Dkt. 110-1, Email to Judy Sterry (4/5/2019), at 43.

10      In 2020, Rose O'Donnell wrote a check to the Foundation but issued a stop

11  payment order because she had intended to make the donation to The Mountaineers.

12  Dkt. 92, Deposition of the Foundation, 54-55.

13      In an email to The Mountaineers, Rose O'Donnell stated that she had previously

14  mistakenly donated to the Foundation intending to donate to The Mountaineers. Dkt. 95,

15  Email from Rose O'Donnell to The Mountaineers (11/23/2020), at 79. Rose O'Donnell

16  also emailed the Foundation stating that she was a longtime donor to the Foundation

17  and that she decided to cease donations when the Foundation changed their goals. Dkt.

18  110-1, Email from Rose O'Donnell to the Foundation (1/28/2020), at 45.

19      The record contains conflicting evidence regarding whether the instances of

20  mistaken donations were caused by confusion as to the source of the services. This

21  factor does not weigh in favor of either party because genuine questions of material fact

22  remain regarding whether these two instances amount to trademark confusion.

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

e.   Marketing Channels Used

The Court must consider whether the parties' customer bases overlap and how parties advertise and market their services. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014). There is a convergence of marketing channels when the general class of purchaser exposed to the product or service overlap. *Id.*

The Mountaineers points to testimony that the two organizations historically shared a donor pool and cooperated in soliciting donations as evidence of overlapping marketing channels. Dkt. 91 at 24; Dkt. 92, Hansen Depo., at 32-33; Dkt. 92, Robisch Depo., at 96-97. This evidence describes the marketing channels and donor lists as they existed when the two organizations worked cooperatively.

Yet the record does not show whether the parties' marketing channels continue to overlap. Although there is evidence that the Foundation has sent a donation solicitation to at least one Mountaineers member, the record does not provide clarity regarding the marketing channels of the respective parties or the extent of their overlap. Genuine questions of fact preclude finding that this factor weighs in favor of either party.

f.   Type of Goods/Services and Degree of Care

The Court must assess the sophistication of the relevant purchaser to determine whether the average purchaser using ordinary caution would take the time to differentiate between the two services. *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1167 (9th Cir. 2021). When the relevant purchaser is an expert in the field of the good or services, and when goods or services are expensive, purchasers can be expected to exercise greater care. *Id.* Purchasers of inexpensive goods are likely to

exercise less care. *Pom Wonderful LLC*, 775 F.3d at 1127. When a purchaser can reasonably be expected to exercise less care consumer confusion is more likely. *Id.*

The Mountaineers argues that the average donor would be expected to exercise less care in distinguishing between the parties because of the long history of affiliation between the parties and due to the delayed nature of bequests. Dkt. 91, at 27. The degree of care that a reasonably prudent donor would exercise depends on the circumstances of the donation.

A finder of fact would need to weigh the circumstances of this case – e.g., the history of the two organizations, donors' potential knowledge of this history, the amount of average donations and the tax consequences of donations -- to determine the degree of care an ordinary donor would exercise. The Court should find that genuine questions of material fact preclude a finding that this factor weighs in favor of either party.

### g. Alleged Infringer's Intent

This factor favors the owner of a trademark when an alleged infringer adopted a mark with actual or constructive knowledges that the trademark was confusingly similar to another's mark. *JL Bev. Co., LLC v. Jim Beam Brands, Co.*, 828 F.3d 1098, 1111 (9th Cir. 2016). The relevant inquiry is whether the alleged infringer adopted the mark with knowledge that the mark belonged to another; the senior owner of the mark need not show malice or intent to confuse. *Id.* The Ninth Circuit has expressed that this factor is of minimal importance because knowledge of prior marks or intent to deceive is not required for a finding of likelihood of confusion. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1132 (9th Cir. 2014)(citing *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000)).

The relevant inquiry for this factor is not whether the alleged infringer adopted a mark with an intention to deceive consumers, but whether the alleged infringer adopted the challenged mark with knowledge of the senior user's trademark. In this case, it is undisputed that members of The Mountaineers formed the Foundation and that historically the two organizations operated cooperatively.

Questions of fact remain regarding the nature of the ongoing relationship between the two organizations, and whether The Mountaineers permitted the Foundation to use to use the name "Mountaineers." These genuine questions of material fact preclude a finding that the Foundation acted with knowledge that their use of the mark would cause confusion.

### h. Likelihood of Expansion of Product Lines

A "strong possibility" that either party will expand their business to compete with the other party weighs in favor of finding that present use is infringing. *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1168 (9th Cir. 2021).

The Court should find that this factor is a neutral factor because the parties have produced evidence showing that both parties provide the same services in the same area and have presented no evidence that either party intends to expand to another competing market, or to offer additional competing goods or competing services. *Pom Wonderful LLC*, 775 F.3d at 1132; *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 509 (9th Cir. 2011) (characterizing the product expansion factor as neutral when neither party presents evidence regarding likelihood of expansion).

1          i.   <u>Conclusion – Issue of Likelihood of Confusion</u>

2          Genuine questions of material fact remain regarding the strength of the marks,

3    evidence of actual confusion, marketing channels, degree of consumer care and intent

4    of the alleged infringer. Determining whether a likelihood of confusion exists is a fact-

5    intensive inquiry that requires weighing all the relevant facts and circumstances

6    surrounding the trademarks at issue.

7          The Court cannot weigh conflicting evidence and decide questions of fact on a

8    motion for summary judgment. The Court should deny The Mountaineers' motion for

9    summary judgment on the issue of likelihood of confusion. With respect to the issues of

10   enforceability of the marks, abandonment of the trademarks <u>concerning fund-raising</u>

11   <u>activities</u> and genericism, summary judgment should be granted in favor of The

12   Mountaineers.

13         3.   <u>The Mountaineers' Seventh Counterclaim – Declaratory Relief</u>

14         The Mountaineers Seventh Cause of Action requests declaratory relief stating

15   that The Mountaineers have an enforceable property right to continued use of the

16   Preserve for historic and present uses. Dkt. 38, The Mountaineers' Second Amended

17   Answer and Counterclaims, at 28. The Foundation argues that the Court should dismiss

18   this cause of action as a matter of law. Dkt. 87, The Foundation's Motion for Partial

19   Summary Judgment, at 18-25.

20         The transfer of the Preserve from The Mountaineers to the Foundation created

21   an easement granting The Mountaineers the right to use the Preserve for historic and

22   present uses subject to the provisions of the open space agreement and applicable law.

23   This easement has not been terminated.

24

25

Contract interpretation is generally a question of law for the Court. *See, Berg v,
Hudesman*, 115 Wn.2d 657, 663 (1990). Washington courts give a "term [within a
contract] its plain, ordinary, and popular meaning." *McLaughlin v. Travelers Commercial
Ins. Co.*, 196 Wn.2d 631, 648 (2020) (internal quotation omitted). The Court cannot
consider words and phrases in isolation, the Court must consider the contract in its
entirety giving effect to each provision. *Moeller v. Farmers Ins. Co. of Wash.*, 173 Wn.2d
264, 271 (2011).

If the language of a contract is clear and unambiguous, the Court "may not
modify the contract or create ambiguity where none exists." *McLaughlin*, 196 Wn.2d at
649 (internal citations omitted). A term is ambiguous if it is susceptible to more than one
reasonable interpretation. *Holden v. Farmers Ins. Co. of Wash.*, 169 Wn.2d 750, 756
(2010). When contract language is ambiguous, the goal of contract interpretation is to
determine the intent of the parties. *Jones Assocs., Inc. v. Eastside Props., Inc.*, 41 Wn.
App. 462, 467 (1985). Ambiguous terms are strictly construed against the drafter. *Id.*

Under Washington law, the Court must use the "context rule" when interpreting
contracts. *Berg*, 115 Wn.2d at 667-670. The context rule allows the court to consider
extrinsic evidence as an aid to ascertaining the parties' intent and meaning of contract
language, regardless of whether the contract language is ambiguous. *Id*. This rule
allows the court to consider extrinsic evidence of the entire circumstances under which
a contract was made. *Id*.

The purpose of this rule is to help understand the meaning of specific words and
terms in the contract, "not to show an intention independent of the instrument or to vary,
contradict or modify the written word." *Hearst Commc'ns, Inc. v. Seattle Times*, 154

1    Wn.2d 493, 503 (2005) (internal quotations omitted). Ultimately, the parties' intent must

2    be determined based on the objective manifestations of the written agreement itself, not

3    the unexpressed subjective intent of the parties. *Condon v. Condon*, 177 Wn.2d 150,

4    162 (2013).

5        When interpreting contracts, "the subjective intent of the parties is generally

6    irrelevant if the intent can be determined from the actual words used." *Hearst*

7    *Commc'ns, Inc.*, 154 Wn.2d 503-04. The Court's duty is "to declare the meaning of what

8    is written, and not what was intended to be written." *Condon*, 177 Wn.2d at 162 (quoting

9    *J.W. Seavey Hop Corp. v. Pollock*, 20 Wn.2d 337, 349 (1944)).

10       In 1985, The Mountaineers transferred the Preserve to the Foundation without

11   cost by warranty deed. Dkt. 89-1, 1985 Conservancy Agreement (06/19/1985), at 4; Dkt.

12   89-1, Correction Deed (08/04/1987), at 10. The Foundation agreed to accept the

13   Preserve, "subject to the conditions of the open space agreement, and subject to the

14   provisions of the nature preserve statute, RCW 84.36.260." *Id.*

15       Because the Foundation lacked the assets, membership and resources to

16   maintain the property, The Mountaineers and the Foundation entered into the 1985

17   Management Agreement. Dkt. 89-1, 1985 Conservancy Agreement, at 4. Under this

18   agreement, the Foundation would own the property and The Mountaineers would

19   manage the property. *Id.* at 5. The parties agreed The Mountaineers "may continue to

20   occupy, use and maintain the Preserve in accordance with its historic uses and in

21   accordance with the terms of [the 1985 Conservancy Agreement] and the [1985]

22   Management Agreement." *Id.* The parties also agreed The Mountaineers retained the

23

24

25

1  right to continue to use the Preserve for historical and present uses after the transfer

2  subject to provisions of the open space agreement and applicable law. *Id.* at 7.

3      The 1985 Management Agreement stated that The Mountaineers would provide

4  maintenance, security, and caretaking services for the Preserve. *Id.* Dkt. 89-1, 1985

5  Management Agreement (06/19/1985), at 17-22. The 1985 Management Agreement

6  was entered for a period of five years terminating on April 30, 1990. *Id.*

7      The Mountaineers had the option to renew the 1985 Management Agreement for

8  unlimited successive renewal terms of five years and the agreement would

9  automatically renew for successive terms unless either party gave written notice

10  terminating the agreement at least six months prior to the end of the term or renewal. *Id.*

11  The 1985 Management Agreement stated that The Mountaineers could continue to use

12  and occupy the Preserve for its own past and present activities, including nature study

13  and other scientific and educational activities consistent with the terms of the open

14  space agreements between Kitsap County and The Mountaineers. Dkt. 89-1, 1985

15  Management Agreement (06/19/1985), at 18.

16      The parties later entered into the 1990 Management Agreement. Dkt. 89-1, 1990

17  Management Agreement (06/19/1990), at 24. The Mountaineers agreed to provide an

18  on-site caretaker to protect the Preserve, provide insurance on the Preserve, consider

19  requests for financial assistance by the Foundation, and that any use of the Preserve

20  would be consistent with the land's conservancy classification. *Id.* The Foundation

21  agreed to provide The Mountaineers unlimited access to the Preserve for: education

22  and enjoyment consistent with RCW 84.36; customary ingress, egress, and easement

23

24

25

1  for utility of The Mountaineers property through the former Wymer Parcel; and parking

2  on the Reid Parcel for Mountaineer events. *Id.*

3        The 1990 Management Agreement automatically renewed for successive five-

4  year terms unless either party gave written notice of termination, at least six months

5  before the end of the term or renewal. Dkt. 89-1, 1990 Management Agreement, at 24.

6  The 1990 Management Agreement also contained a provision stating: "This agreement

7  contains the entire understanding of the parties as to the Management Agreement for

8  The Preserve between The Mountaineers and The Mountaineer Foundation and

9  supersedes the Management Agreement dated June 19, 1985, except for (9) Finances

10  of the Conservancy Agreement remains in full force and effect." *Id.*

11        In 2019, the Foundation sent The Mountaineers a letter formally terminating the

12  1990 Management Agreement and the 1985 Conservancy Agreement effective June

13  20, 2020. Dkt. 89-1, Letter from the Foundation (12/11/2019), at 26-29.

14        1.  Easement Formation

15        The declaratory judgment action requires the Court to determine whether the

16  1985 Conservancy Agreement created an easement granting The Mountaineers

17  property rights in the Preserve.

18        Easements create a property right and amount to an encumbrance on real

19  property that must comply with the statute of frauds. *Proctor v. Huntington*, 146 Wn.App.

20  836, 852-53 (2008). The conveyance of real property rights must be accomplished by

21  deed, in writing, signed by the bound parties, and acknowledged by a person authorized

22  to take acknowledgments of deeds. *Bale v. Allison*, 173 Wn. App. 435, 445 (2013)

23  (citing RCW 64.04. 010; .020).

24

25

The rules of contract interpretation apply to the interpretation of easements and deeds. *Pelly v. Panasyuk*, 2 Wn. App. 2d 848, 864 (2018). Interpreting easements and deeds is a mixed question of law and fact. *Id.* ("What the original parties intended is a question of fact and the legal consequence of that intent is a question of law.").

The Court may consider the following types of extrinsic evidence when interpreting an easement: "(1) subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usage of trade, and (7) the course of dealing between the parties." *Id.* at 866. Such evidence may be considered regardless of whether the language of the documents is ambiguous. *Id.*

A contract may consist of multiple documents and all documents that are part of the same transaction must be interpreted together. *Kelley v. Tonda*, 198 Wn. App. 303, 311 (2017) (quoting 5 Margaret N. Kniffen, Corbin on Contracts § 24.21, at 216) ("The terms of agreement may be expressed in two or more separate documents, some of these containing promises and statements as to consideration, and others, such as deeds,… embodying performances agreed upon rather than a statement of terms to be performed. In every such case, these documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others"). Documents that are part of the same transaction, relate to the same subject matter and executed at the same time should be read and construed together as one contract, even if the instruments do not refer to each other. *Cedar River Water & Sewer Dist. v.*

*King County*, 178 Wn.2d 763, 784-85 (2013). Whether two separate agreements are part of the same transaction depends on the intent of the parties as demonstrated by the agreement." *Pelly*, 2 Wn. App. 2d at 868.

It is undisputed that the 1985 Conservancy Agreement and the 1985 Management Agreement were executed on the same date, June 19, 1985. It is also undisputed that the 1985 Conservancy Agreement and the 1985 Management Agreement both address the same transaction – the transfer by warranty deed of the Preserve from The Mountaineers to the Foundation.

Both agreements address the rights and responsibilities of the respective parties to the agreements. The only deed in the record is a Correction Deed executed on August 4, 1987. Dkt. 89-1, Correction Deed (08/4/1987), at 10. The Correction Deed was executed to correct the legal description in a deed previously executed by the parties. *Id.*

The 1985 Conservancy Agreement and the 1985 Management Agreement are contemporaneously-signed documents relating to the same subject matter and same transaction. The Court should therefore construe these agreements as one contract. *Cedar River Water & Sewer Dist.*, 178 Wn.2d at 784-85.

The 1985 Conservancy Agreement expressly references that the transfer of property was executed by deed. The Correction Deed indicates that the parties executed a deed effectuating this transfer. Accordingly, because all four agreements relate to the same transaction, as well as related conditions, responsibilities, and rights, the Court should consider the 1985 Conservancy Agreement, the 1985 Management Agreement, the warranty deed, and Correction Deed as part of the same contract.

Additionally, the parties' conduct (before and after the 1985 Agreements) indicates an intent to create an easement granting The Mountaineers the right to access and use the Preserve.

In April 1985 -- two months before the 1985 Agreements -- the President of The Mountaineers wrote an article in The Mountaineer publication, addressing the Preserve. Dkt. 93, Declaration of Delmar Fadden, at ¶ 10; Dkt. 93, The Mountaineer (April 1985) at 10-11. In the article, Fadden explained that an ad hoc committee of The Mountaineers recommended The Mountaineers deed the Preserve to the Foundation subject to certain conditions. Dkt. 93, The Mountaineer (April 1985) at 10-11.

One of the conditions described in this article was "The Mountaineers and the Foundation will execute contractual agreements to guarantee perpetual management and maintenance of the property in its present natural state and to preserve present and historical Mountaineer uses of the property." *Id*. The article also explained that the proposed contractual agreement would provide for continuation of historical uses by The Mountaineers. *Id*.

In 1994, The Mountaineers and the Foundation jointly negotiated and executed easements with private individuals and Kitsap County. Dkt. 94, Hansen Easement (05/31/1994); at 9-10; Dkt. 94, Access Easement (08/08/1994), at 12-15. These easements allowed The Mountaineers and the Foundation to cross particular properties to access the Preserve. *Id*. The Foundation's Board Policy and Procedures Manual acknowledges that the parties executed "contractual agreements to guarantee perpetual management and maintenance of the property in its present natural state and to

1   preserve present and historical Mountaineer uses of the property." Dkt. 92, The

2   Foundation's Board Policy and Procedures Manual (updated 11/6/1996) at 64, 69.

3         Further, the 1990 Management agreement acknowledges that The Mountaineers

4   have an "easement for utilities to the Mountaineers property through the former Wymer

5   Parcels." Dkt. 89-1, 1990 Management Agreement, at 24.

6         The Court should find that the 1985 Conservancy Agreement, the 1985

7   Management Agreement, the warranty deed and the Correction Deed, when considered

8   together, create an easement between The Mountaineers and the Foundation, granting

9   The Mountaineers: "the right to continue to use the Preserve for historic and present

10  uses after the transfer to The Foundation for Mountaineers activities, subject to the

11  provisions of the open space agreement and applicable law."

12        2.  Easement Termination

13        Next, the Court must determine whether the Foundation validly terminated The

14  Mountaineers' easement to use the Preserve.

15        "Termination of easements is disfavored under the law." *Hurlbut v. Crines*, 14

16  Wn.App. 2d 660, 670 (2020) (quoting *City of Edmonds v. Williams*, 54 Wn. App. 632,

17  636 (1989)). "Easements are extinguishable only in specific situations such as when the

18  easement holder releases it in an instrument that complies with the statute of frauds, the

19  owner of the servient estate uses the easement adversely, the easement is abandoned,

20  or the dominant and servient estate merge." *Hanna v. Margitan*, 193 Wn. App. 596, 606-

21  07 (2016).

22        The Foundation argues that the rights set forth in the 1985 Conservancy

23  Agreement were terminated because the 1990 Management Agreement superseded

24

25

1  the 1985 Conservancy Agreement, and because the Foundation gave The

2  Mountaineers actual and reasonable notice of its intent to terminate the agreement in

3  December 2019. Dkt. 87 at 19-25.

4      The Foundation's 2019 letter is insufficient to terminate the easement created by

5  the 1985 Conservancy Agreement, the 1985 Management Agreement and the related

6  deeds. Similarly, the 1990 Management Agreement is insufficient to terminate the

7  easement. Because the letter, and the 1990 Management Agreement, do not fit into any

8  of the specific circumstances needed to terminate an easement under Washington law

9  as set forth in *Hanna v. Margitan*, partial summary judgment should be granted to The

10  Mountaineers on the issue of whether an easement was created, and if it was validly

11  created under Washington law, whether the easement has been terminated under

12  Washington law.

13      There are no genuine disputes of material fact on the easement issue; the Court

14  should find that the 1985 Conservancy Agreement, 1985 Management Agreement and

15  the related deeds created an easement -- granting The Mountaineers a non-possessory

16  property right to use the Preserve for the purpose set forth in these agreements. The

17  Court should also find as a matter of law that the Foundation has not validly terminated

18  the easement.

19                            **CONCLUSION**

20      Based on the foregoing discussion, the undersigned recommends that the Court

21  DENY the Foundation's motion for partial summary judgment (Dkt. 87) and GRANT IN

22  PART and DENY IN PART The Mountaineers' motion for summary judgment (Dkt. 91).

23

24

25

REPORT AND RECOMMENDATION - 48

The Court should grant the cross-motion for summary judgment in favor of the Mountaineers on the issue of protectable ownership interest in a protectable trademark, finding that The Mountaineers own a protectable trademark interest in the following marks: 305 Mark (THE MOUNTAINEERS word mark), the 307 Mark (THE MOUNTAINEERS design mark) and 968 Mark (MOUNTAINEERS BOOKS word mark) for charitable fundraising services for the environment; conservation; outdoor recreation; outdoor education; natural history; and books in the field of environmental conservation, outdoor recreation and natural history. The Court should grant the cross-motion for summary judgment in favor of The Mountaineers on the issue of genericism -- and find that The Mountaineers trademarks are not generic for -- charitable fundraising services for the environment; conservation; outdoor recreation; outdoor education; natural history; and books in the field of environmental conservation, outdoor recreation and natural history.

Because summary judgment on this issue should be granted in favor of The Mountaineers, the Court should strike the Foundation's Fifth Affirmative Defense.

The Court should grant the cross-motion for summary judgment in favor of The Mountaineers on the issue of trademark abandonment finding that The Mountaineers has not abandoned their trademark rights for charitable fundraising services. Summary judgment on the abandonment affirmative defense should not be granted with respect to the other goods or services provided by The Mountaineers. The Court should strike the Foundation's Sixth Affirmative Defense as to charitable fund-raising services.

The Court should grant the cross-motion for summary judgment on the Mountaineers' counterclaim for declaratory relief stating that The Mountaineers have a

valid easement granting them "the right to continue to use the Preserve for historic and present uses after the transfer to The Foundation for Mountaineers activities, subject to the provisions of the open space agreement and applicable law" as set forth in the parties' 1985 Conservancy Agreement and 1985 Management Agreement.

All remaining claims in this action should proceed.

The parties have fourteen (14) days from service of this Report and Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6; FRCP 72(b)(2). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). If objections are filed, the parties shall have fourteen (14) days from the service of the objections to file a response. FRCP 72(b)(2). Accommodating this time limitation, this matter shall be set for consideration on April 22, 2022, as noted in the caption.

Dated this 8th day of April, 2022.


Theresa L. Fricke
United States Magistrate Judge